**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SHEILA H.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 18 C 7379** |
| | ) | |
| **ANDREW M. SAUL,** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Plaintiff Sheila H. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI, respectively, of the Social Security Act ("SSA"). (Doc. 1). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the case was reassigned to this Court. (Docs. 7, 11). Plaintiff filed a brief arguing that the Commissioner's decision should be reversed or the case should be remanded, and the Commissioner responded with a competing motion for summary judgment. (Docs. 16, 23, 24). After careful review of the record and the parties' respective arguments, the Court concludes that the case must be remanded for further proceedings as outlined below. The Court therefore denies the Commissioner's motion and grants Plaintiff's request for remand.

## BACKGROUND

**I. Procedural History**

Plaintiff applied for DIB and SSI on May 20, 2014, alleging disability since June 26, 2013 due to mild stroke, vision problems, fibroids, high blood pressure, and cholesterol. (R. 412, 414, 434, 508-09, 520-21, 531-34, 551-52, 569-70, 676-88, 696-97, 700, 742, 767). Born in 1961, Plaintiff was 51 years old at the time of the alleged onset date (R. 421, 508, 520, 533, 551), which is defined as an individual closely approaching advanced age. 20 C.F.R. § 404.1563(d).[1] Plaintiff subsequently changed age category (R. 421) and, by the time of the administrative hearing, was 55 years old, which is defined as an individual of advanced age. 20 C.F.R. § 404.1563(e). Her date last insured was December 31, 2014. (R. 412, 414, 434, 520, 533, 551, 742, 767).

The Social Security Administration denied Plaintiff's applications initially on October 1, 2014 and on reconsideration on August 21, 2015. (R. 412, 532-32, 569-74, 576-79, 588-90, 592-94). Plaintiff then requested a hearing, which was later held before Administrative Law Judge ("ALJ") Michelle Whetsel on August 15, 2017, where Plaintiff was represented by counsel. (R. 412, 429, 435-39, 596-602). Both Plaintiff and Vocational Expert ("VE") Thomas Gusloff testified at the hearing. (R. 412, 429, 440-503).

The ALJ denied Plaintiff's claims in a decision dated February 8, 2018. (R. 412-22). The ALJ found that Plaintiff's degenerative disc disease of the cervical spine, chronic kidney disease, osteoarthritis, diastolic dysfunction, transient ischemic attack, fibroids, status post hysterectomy, and obesity are severe impairments, but they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 414-16). The ALJ concluded that Plaintiff was not disabled from her June 26, 2013

---

[1]     Because the regulations governing DIB and SSI are substantially identical, for convenience, only the DIB regulations are cited herein.

alleged onset date through the date of the decision because she retains the residual functional capacity ("RFC") to perform light work with physical limitations, as described to the VE, and is capable of performing past relevant work and other jobs that exist in significant numbers in the national economy. (R. 412, 416-22). The Appeals Council denied Plaintiff's request for review on September 7, 2018 (R. 1-7), rendering the ALJ's February 2018 decision the final decision of the Commissioner reviewable by this Court. *Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

In support of her request for reversal or remand, Plaintiff argues that the ALJ erred in: (1) determining Plaintiff's RFC with respect to reaching, standing, and walking; (2) assessing her subjective symptom allegations; and (3) relying on the VE's testimony. As explained below, the Court concludes that remand is required for the ALJ to reconsider the RFC determination, reassess Plaintiff's subjective statements, and consult a VE as appropriate based on reconsideration of the RFC determination.

## II.    Medical and Other History

Plaintiff completed high school and one year of college. (R. 485, 701). As of the date of the hearing, she lived alone in a first floor apartment in the same complex as her three adult daughters. (R. 456-57, 474-75, 477-78). Plaintiff previously worked as a cashier checker from 1992 to 2006, cashier gambling for about six months in 2006, and child monitor from 2006 to 2009. (R. 440-41, 447, 451, 484, 701, 756). She last worked babysitting for her grandchildren in 2009 (earning around $800 per month), but stopped because she moved out of state in 2010 (and then moved back in about 2013). (R. 451, 454-56, 700). She also worked babysitting for her grandchildren again for several months in 2016 (for fewer hours than before). (R. 454-55).

Plaintiff regularly treated with her primary care practice from October 2012 (before the June 26, 2013 alleged onset date) to May 2017, including for hypertension, migraine headaches, anemia, prediabetes, uterine bleeding and fibroids, kidney disease, and episodes of right-sided tingling and pain.  (R. 847-70, 971-78, 1056-70, 1196-1251, 1358-87, 1395-1400, 1409-57, 1488-89, 1492-1507, 1728-82, 1863-1953).[2]  Treatment records reference a history of transient ischemic attacks ("TIAs") in June 2013 and September 2014.  (R. 859-60, 1245-28, 1234-40, 1409-22, 1604-06).  Treatment records also reflect an occurrence of edema in both ankles in 2016.  (R. 1768-71).  Treatment records in 2017 additionally mention "likely osteoarthritis" and a history of arthritis of the knees, though x-rays were "unremarkable[.]"  (R. 1868-72, 1890-1904, 1926-29).

Plaintiff was prescribed medication for hypertension, migraine headaches, and anemia as well as diet for hypertension and prediabetes.  (R. 865-68).  In 2015, Plaintiff's hypertension medication was adjusted, and she took medication as prescribed but did not follow diet recommendations.  (R. 1728-31, 1735-42).  She continued medication for, and monitoring of, hypertension in 2016 and 2017, and her hypertension was controlled.  (R. 1772-75, 1779-82, 1863-77, 1909-13).

Plaintiff went to the emergency room several times in 2013 and 2014 for episodes of right-sided tingling and pain.  (R. 826-36, 845-46, 857-58, 908-12, 915-18, 922-23, 963-95, 979-88, 1005-06, 1009-10, 1023-31, 1050-55, 1072-96, 1103-05, 1140-1180, 1217-23, 1446-57, 1698-99).  In May 2013, Plaintiff visited the emergency room

---

[2]     The administrative record includes additional records from this practice and other providers.  (R. 8-405).  Those records were not before the ALJ (*see* R. 2, 423-28, 433), and the parties do not cite them.  (*See generally* Docs. 16, 24, 28).  Accordingly, this Court does not consider them.

complaining of right-sided face, arm, and leg tingling and was assessed with "[p]robable poor sensory syndrome consider left thalamic infarct." (R. 826-30). An echocardiograph report indicated normal left ventricular size and systolic function and no significant valvular abnormalities; a head CT was "[n]egative[;]" a chest x-ray was "[u]nremarkable[;]" an MRI and MRA showed "[n]o acute intracranial abnormality[,]" "[q]uestionable subtle leptomenigeal enhancement bilaterally[,]" "[t]iny scattered subcortical white matter lesions of uncertain etiology or clinical significance[,]" and "[u]nremarkable" MRA of the head and "[e]ssentially unremarkable" MRA of the neck; and a carotid ultrasound was "[e]ssentially unremarkable[.]" (R. 831-36).

One year later, in May 2014, Plaintiff went to the emergency room complaining of tingling in her right arm, blurred vision in her right eye, and palpitations and was diagnosed with palpitations. (R. 908-10, 915-18). Imaging of the chest revealed no acute airspace disease; and a head CT showed no acute intracranial hemorrhage or process and no skull fracture. (R. 909-12, 922-23). In June 2014, she reported no further palpitations. (R. 845-46).

Later the same year, in early September 2014, Plaintiff visited the emergency room for a headache and right arm tingling and was diagnosed with cervical radiculopathy. (R. 979-88, 1072-96). A CT of the cervical spine showed mild degenerative changes and no acute bony abnormality; a CT of the head showed "[n]o obvious acute intracranial abnormality[;]" and a chest x-ray revealed no acute cardiopulmonary abnormality. (R. 963-65, 1103-05). In late September 2014, Plaintiff returned to the emergency room for an acute episode of right-sided face and tongue tingling and numbness, difficulty with speech, right arm heaviness, and right leg weakness. (R. 1023-31). "[S]imilar symptoms"

about a week prior (presumably referring to the early September 2014 visit) and about a year earlier with a "negative workup" (apparently referring to the May 2013 treatment records) were noted. (R. 1027). After an "extensive workup" (including numerous diagnostic tests) was "negative essentially[,]" Plaintiff was found "most likely" to have had a "migraine variant versus TIA[,]" and the final diagnosis on discharge was right-sided facial numbness that resolved of unclear etiology. (R. 1005-06, 1009-10, 1029, 1050-55, 1692-95, 1696-1701).

Several months later, in December 2014, Plaintiff went to the emergency room complaining of right shoulder, arm, and back pain and was diagnosed with right shoulder strain. (R. 1140-1180, 1689-90). A stress test demonstrated normal myocardial perfusion scan with no evidence of ischemia; and a chest x-ray showed no acute radiographic process and stable examination. (R. 1141-42, 1148, 1156, 1167, 1687-88).

Plaintiff was referred to a neurologist for evaluation in connection with the right-sided tingling and pain issues. (R. 1241-44, 1779-82). In December 2014 and March 2015, the neurologist diagnosed Plaintiff with cervical radiculopathy. (R. 1313-17, 1330-34). In March 2015, Plaintiff had an electromyography ("EMG") evaluation for "neuropathy in the right upper extremity vs cervical radiculopathy." (R. 1185). She presented with cervical pain radiating down her right arm to three fingers "associated with paresthesias." (*Id.*). No weakness or numbness was noted on examination, and the EMG revealed a "[n]ormal study" with "no electrodiagnostic evidence of neuropathy, plexopathy, or radiculopathy." (R. 1185-88).

At a neurology visit in August 2015, Plaintiff reported that her pain was well controlled with Gabapentin and noted occasional radiating pain but denied weakness or

numbness. (R.1587-89). An examination was negative for weakness or numbness, an EMG was negative for radiculopathy, and there was "[n]o need for any further w/u [workup]." (R.1588). In September 2016, Plaintiff complained of "recently worsened" pain in the neck and right upper extremity as well as occasional loss of right hand grip and difficulty opening bottles. (R. 1604-06). The doctor noted that the pain "settle[d]" with Tylenol and that Plaintiff was compliant with Gabapentin, which was increased. (R. 1605). In November 2016, an MRI of the cervical spine showed mild degenerative disease without significant neural foraminal or canal narrowing, and an MRI of the brain demonstrated an age appropriate study without findings to suggest acute or chronic cortical ischemia. (R. 1617-20, 1626). December 2016 neurology notes stated that, while the prior increase of Gabapentin was limited due to Plaintiff's chronic kidney disease, she had not taken the increased dosage due to an apparent issue with insurance coverage; and, because Plaintiff reported considerable improvement of the pain and numbness and in light of her chronic kidney disease, Gabapentin was continued at the current dose. (R. 1621-27).

Plaintiff also treated with a cardiologist from 2015 to 2017 for palpitations. (R. 1234-40, 1347-50, 1665-78, 1868-72, 1890-1904). In May 2016, the palpitations were less frequent, self-resolving, and not associated with lightheadedness, shortness of breath, or dizziness. (R. 1673-74). In December 2016, Plaintiff reported a sudden increase in the frequency of palpitations. (R. 1675-76). Chest imaging in December 2016 revealed no acute cardiopulmonary abnormalities. (R. 1933-36). A January 2017 echocardiogram showed "[n]ormal LV systolic function[,]" "IV Septum non-Obstructive Hypertrophy[](DUST)[,]" "EF 60-65%[,]" "[n]ormal RV function[,]" "[d]iastolic dysfunction

grade 1[,]" "[m]ild PA HTN[,]" no pericardial effusion, and no significant valvular abnormality. (R. 1679-80). March 2017 primary care treatment notes indicated that Plaintiff's palpitations were controlled with medication. (R. 1868-72). And, in April 2017, Plaintiff told the cardiologist that she felt better. (R. 1677-78).

Plaintiff additionally saw a nephrologist from 2015 to 2016 for chronic kidney disease. (R. 1234-40, 1324-29, 1339-40, 1580-86, 1596-1601, 1608-14, 1868-72, 1890-1904). The "[o]verall trend in renal function [was] stable[.]" (R. 1600, 1613).

Plaintiff had eye examinations for blurry vision in 2014, 2015, and 2017. (R. 934-39, 1630-34, 1656-60). She was prescribed glasses for near use, which improved her vision. (R. 934-39, 1630-34). There was no sign of an ocular manifestation of diabetes. (R. 934-39). Plaintiff had an age-related cataract, which did not require treatment because her vision and activities of daily living were not affected. (R. 1656-60).

In June 2017, Plaintiff underwent a hysterectomy. (R. 1785-95, 1796-1856). She had been offered nonsurgical management, but elected surgery due to bothersome vaginal bleeding. (R. 1802-08). At a July 2017 postoperative visit, Plaintiff was "doing well without complaints." (R. 1857-59)

## III. Consultative Examinations

On September 6, 2014, Charles Carlton, M.D. conducted an Internal Medicine Consultative Examination. (R. 946-55). Plaintiff described osteoarthritis in her knees and hands, and she reported occasionally driving, walking approximately three to four blocks before having to stop at least twice due to knee pain, standing probably 30 minutes maximum, and stopping medication because she developed an allergic reaction. (R. 947). Plaintiff stopped working in 2006 because she pulled a muscle while pushing a cart

at work, and she could not resume working due to persistent pain pushing heavy carts and difficulty with prolonged standing and walking.  (R. 948).  She was independent with her activities of daily living.  (R. 948).

On physical examination, Dr. Carlton observed that Plaintiff could rise from sitting to standing without assistance, displayed normal reciprocal gait and walked more than 50 feet without using an assistive device, had full painless range of motion in all joints except the hips and knees and mild decreased range of motion in the lumbar spine, and had normal grip strength and fine and gross motor skills in both hands.  (R. 948-49).  Dr. Carlton noted normal neurologic findings.  (R. 949).  Dr. Carlton described Plaintiff's problems as: obesity; May 2013 treatment records non-diagnostic for stroke, but Plaintiff said that providers told her she likely suffered a TIA, and she reported residual numbness in her right middle finger but not blurred vision presently or during the "alleged TIA[;]" ongoing medical workup for uterine fibroid disease, including possible surgery; high blood pressure and high cholesterol treated with medication; and described history of arthritic pain in hands and knees and limited tolerance for standing and walking.  (R. 950).  Dr. Carlton opined that Plaintiff could safely sit and stand, walk more than 50 feet without an assistive device, handle objects with both hands, lift 20 pounds, and hear and speak, and he described this assessment as a "conservative estimate" of her functional ability.  (*Id.*).

On July 28, 2015 M.S. Patil, M.D. conducted an Internal Medicine Consultative Examination.  (R. 1353-56).  Plaintiff reported that she had three TIAs in 2014 and complained of recurrent mild pain in her upper extremities, but she did not report difficulties with physical activities, gait disturbance, headaches, dizziness, shortness of breath, chronic cough, or chest pain.  (R. 1353).  Plaintiff had been diagnosed with uterine

fibroids and a hysterectomy had been advised, for which she was working on getting clearance to proceed from her cardiologist, nephrologist, and neurologist. (*Id.*). She denied other ailments. (*Id.*).

On physical examination, Dr. Patil observed no obvious deformities of the spine, no paravertebral tenderness or spasm, no edema or calf tenderness, and no limitations of range of motion. (R. 1355). Dr. Patil noted normal neurologic findings, including 5/5 motor strength in all extremities. (*Id.*) Dr. Patil's diagnostic impression included normal gait, hand dexterity, speech, memory, and mentation. (R. 1356). Dr. Patil also stated that Plaintiff was mildly obese. (*Id.*).

## IV.    State Agency Reviewing Physician Opinions

On September 26, 2014, Charles Kenney, M.D. opined that Plaintiff could occasionally lift or carry 20 pounds, could frequently lift or carry ten pounds, and was unlimited as to pushing or pulling; could stand, walk, or sit for about six hours; could frequently climb ramps, stairs, ladders, ropes, or scaffolds; could frequently stoop, kneel, crouch, or crawl; and should avoid concentrated exposure to extreme cold and hazards. (R. 514-17). On August 12, 2015, James Madison, M.D. rendered the same opinion, but his opinion dated August 13, 2015 indicated that Plaintiff's ability to climb ladders, ropes, or scaffolds (but not ramps or stairs) was unlimited. (R. 541-48).[3]

## V.    Administrative Hearing

On August 15, 2017, Plaintiff appeared with counsel at a hearing before ALJ Whetsel. (R. 429). Plaintiff testified that she had suffered three mild strokes in 2013 and

---

[3]    The record includes these two slightly different residual functional capacity assessments by Dr. Madison dated one day apart. (R. 541-42, 545-46, 548).

2014. (R. 457-60, 462-63). She continued to experience dizziness, blurred vision, and numbness or tingling in her right arm and neck, and she felt tired since having the strokes. (R. 458-59, 472). Plaintiff took Gabapentin, which diminished the right arm tingling and pain, but the dosage was limited so as not to affect her kidneys. (R. 464-65). She also sometimes took Tylenol. (R. 468-69). Plaintiff could not lift anything heavy, including her purse, with her right arm. (R. 465, 467). She could use her right arm for about an hour before experiencing pain and needing to rest it. (R. 467-68). Sometimes she could resume what she had been doing, but, when the arm bothered her, she would not use it for several days and would elevate it. (R. 466-68).

Plaintiff took medication for chronic kidney disease. (R. 462-63). As a result of her kidney problems, she had pain in her left side and back as well as swelling in her knees and ankles. (R. 462-63, 469). Plaintiff experienced palpitations. (R. 459-60). She had high blood pressure. (R. 463). She had anemia, for which she took iron pills or received injections. (R. 471-72). Plaintiff also had blurry vision, for which she was prescribed reading glasses, which did not resolve the issue. (R. 460-62). She experienced sudden dizziness so only drove once a week to the pharmacy or gas station nearby. (R. 470-71, 476, 478). She only walked to the corner and back because she got "off balance." (R. 472-73).

Plaintiff cared for her personal hygiene unless her right arm bothered her, in which case her daughter helped her wash up and dress four times a week. (R. 475, 480). She did not go grocery shopping. (R. 476). When her grandchildren visited, they watched television and played on their tablets. (R. 474-75). Plaintiff made sandwiches, but not big meals. (R. 476). She played bingo off and on and attended church. (R. 478-79).

11

In response to questions from the ALJ, the VE testified about the ability of a person of Plaintiff's age, education, and work experience who could perform the full range of light work except: could occasionally climb ramps and stairs; could never climb ladders or scaffolds; could occasionally balance, stoop, kneel, crouch, and crawl; could frequently reach in all directions with the right upper extremity; and must avoid concentrated exposure to extreme heat, extreme cold, moving machinery, and unprotected heights. (R. 484-86, 502).[4]  Such a person could perform Plaintiff's past work (Cashier Gambling). (*Id.*).  Such a person also could perform other jobs at the sedentary level that existed in significant numbers in the national economy, such as Cashier Checker, Food Checker, and Pricer Messenger and Delivery Services.  (R. 486-88, 502).  If such a person were limited to occasionally reaching in all directions with the right upper extremity, the past work and those other jobs would be eliminated, but such a person under age 55 could perform unskilled jobs at the light level, such as Investigator Dealer Accounts, Counter Clerk, and Usher.  (R. 488-89, 502-03).

## DISCUSSION

### I.    Governing Standards

#### A.    Standard of Review

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g) of the SSA. In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the applicable regulations.  *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).  Nor may it "'displace the ALJ's judgment

---

[4]     The hypothetical question to the VE states that the person could never climb ladders or scaffolds (R. 484-86, 502), but the RFC limits Plaintiff to never climbing ladders, scaffolds, and ropes (R. 416-17).  The parties' briefs do not address the discrepancy as to ropes.

by reconsidering facts or evidence or making credibility determinations.'" *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)).

In making its determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'" *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## B. Five-Step Inquiry

To recover disability benefits under the SSA, a claimant must establish that he is disabled within the meaning of the SSA. *Snedden v. Colvin*, No. 14 C 9038, 2016 WL 792301, at *6 (N.D. Ill. Feb. 29, 2016). A claimant is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing: "(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520). If the claimant meets his burden of proof at steps one through four, the burden shifts to the Commissioner at step five. *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1139-40 (N.D. Ill. 2012).

## II. Analysis

### A. RFC

A claimant's RFC is the maximum work that she can perform despite any limitations. *See* 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, 1996 WL 374184, at *2. "Although the responsibility for the RFC assessment belongs to the ALJ, not a physician, an ALJ cannot construct his own RFC finding without a proper medical ground and must explain how he has reached his conclusions." *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012). Here, the ALJ determined that Plaintiff retained the RFC to perform light work where she could occasionally lift or carry 20 pounds; could frequently lift or carry ten pounds; could sit, stand, or walk up to six hours; could occasionally climb ramps and stairs; could never climb ladders, ropes, and scaffolds; could occasionally balance, stoop, crouch, kneel, and crawl; could frequently reach in all

14

directions with her right upper extremity; and must avoid concentrated exposure to extreme heat, extreme cold, moving machinery, and unprotected heights. (R. 416-17). Plaintiff challenges the ALJ's conclusions with respect to reaching as well as standing and walking. Each argument is addressed in turn.

### 1. Frequently Reaching in All Directions with Right Arm

Plaintiff first argues that the ALJ failed to explain or identify evidence to support the RFC finding of frequent reaching in all directions with the right arm. (Doc. 16, at 5-7; Doc. 28, at 1-3). This Court agrees. Apart from the RFC finding itself, the ALJ did not mention Plaintiff's ability to reach with (or otherwise use) her right arm in particular in the decision nor explain how the evidence supported that finding.

Plaintiff claimed in a function report that she had trouble reaching overhead (R. 728), and she testified that she could only use her right arm for about an hour before experiencing pain and needing to rest it, she sometimes would not use that arm for days, and her daughter helped her wash up and dress four times a week when the arm bothered her. (R. 467-28, 466-68, 475, 480). The ALJ did not discuss this evidence. In addition, the ALJ reviewed medical records that included multiple references to Plaintiff's various right arm problems, such as: tingling in May 2013 and May 2014 (R. 417-18, citing R. 826, 829, 916); heaviness in September 2014 (R. 418, citing R. 1024-25); an assessment of radiculopathy in October 2014 (R. 418, citing R. 1481); shoulder strain in December 2014 (R. 414, citing R. 1176; *see* R. 1140-1180, 1689-90); and cervical pain radiating down the right arm to three fingers (but no weakness or numbness) on EMG evaluation

in March 2015. (R. 419, citing R. 1185).[5] Yet the ALJ did not explain how any of this evidence demonstrates an ability to reach frequently with the right arm.

In addition, the opinion evidence does not support the RFC determination as to reaching. The ALJ considered the September 2014 findings of consultative examiner Dr. Carlton and accorded his opinion great weight (R. 418, 420), but Dr. Carlton did not evaluate Plaintiff's reaching abilities. (*See* R. 946-55). The ALJ also discussed the July 2015 findings of consultative examiner Dr. Patil (R. 419), who likewise did not assess reaching. (*See* R. 1353-56). State agency reviewing physicians Drs. Kenney and Madison, whose opinions the ALJ accorded some weight (R. 420), similarly rendered no opinions regarding reaching. (*See* R. 514-17, 541-48).

## 2. Standing and Walking up to Six Hours

Plaintiff next argues that the ALJ failed to explain the RFC findings of standing and walking up to six hours. (Doc. 16, at 7-9; Doc. 28, at 3-5). Again, this Court agrees.

In making these RFC findings, the ALJ relied on Dr. Carlton's observations on consultative examination in September 2014 that Plaintiff rose from sitting to standing without assistance, displayed normal reciprocal gait, and walked more than 50 feet without using an assistive device. (R. 418, 948-49). And the ALJ gave great weight to Dr. Carlton's overall opinion that Plaintiff could safely sit, stand, and walk more than 50

---

[5]     The ALJ referenced treatment in May 2013 for right-sided weakness (R. 417, citing R. 826, 829), though the record indicates right arm tingling. (R. 826-30). The ALJ also generally noted (unspecified) shoulder sprain (R. 414, citing R. 1176), though the record indicates right shoulder strain in December 2014. (R. 1140-1180, 1689-90). The ALJ additionally noted some mild and normal findings, namely: diagnostic testing, which showed mild degenerative disc disease of the cervical spine in September 2014 and November 2016 (R. 418-20, citing R. 963, 1617); and the March 2015 EMG report, which (despite pain) revealed a normal study with "no electrodiagnostic evidence of neuropathy, plexopathy, or radiculopathy." (R. 419, citing R. 1185, 1187).

feet. (R. 418, 420, 948-50). The ALJ also relied on Plaintiff's report to Dr. Patil on consultative examination in July 2015 that she did not have difficulties with physical activities as well as Dr. Patil's normal findings on examination, including as to Plaintiff's gait. (R. 419, 1355-56).

In addition, the ALJ accorded some weight to the state agency reviewing physicians' opinions (R. 420), which concluded that Plaintiff could stand, walk, or sit for about six hours. (R. 514-17, 541-48). The state agency reviewing physicians based those conclusions on two records in particular: Dr. Carlton's consultative examination (R. 514, 516, 542, 544; *see* R. 946-51); and a July 2014 emergency room visit for dental pain, where a nurse noted that Plaintiff arrived ambulatory and had a steady gait, and she was discharged ambulating without assistance. (R. 514, 516, 542, 544; *see* R. 902-05). The foregoing opinions each rely in part on Plaintiff's ability to walk more than 50 feet without an assistive device (or simply to walk unassisted). As the Seventh Circuit has explained, however, a claimant's ability to walk for 50 feet without an assistive device may not necessarily demonstrate her ability to stand for six hours. *See Thomas v. Colvin*, 534 Fed. Appx. 546, 551 (7th Cir. 2013) (citing *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011)).

Moreover, the ALJ's discussion of Plaintiff's alleged standing and walking limitations relied on an unduly selective recitation of the evidence. The ALJ addressed Plaintiff's reports to Dr. Carlton of having osteoarthritis in her knees, and being able to stand up to 30 minutes and walk up to four blocks, as well as Dr. Carlton's observation of reduced range of motion of the knees. (R. 417-18, 947-50). But the ALJ ignored Plaintiff's statements that, after walking approximately three to four blocks, she had to stop at least

twice due to knee pain and that she could not go back to work following an injury in 2006 due, in part, to difficulty with prolonged standing and walking. (R. 947-48). The ALJ also made no mention of Plaintiff's testimony that she experienced dizziness and only walked to the corner and back because she got "off balance." (R. 458-59, 470-73, 476, 478). And, although the ALJ noted that Plaintiff had swelling in her knees and ankles as a result of kidney disease (R. 417, 719, 724), the ALJ did not discuss other claimed issues related to kidney problems, namely left side and back pain. (R. 462-63, 469). Nor did the ALJ address Plaintiff's testimony that, since suffering from strokes, she felt tired. (R. 472). While the ALJ need not discuss every piece of evidence, the ALJ nonetheless must build a logical bridge from the evidence to the RFC findings that Plaintiff can stand and walk up to six hours. *See Simila*, 573 F.3d at 513; *Pepper*, 712 F.3d at 362.

Plaintiff also asserts that the ALJ should have considered the combined effect of palpitations, anemia, and obesity on her ability to stand and walk. (Doc. 16, at 15; Doc. 28, at 11-12). While the ALJ's decision addressed those conditions (*see* R. 414, 417-20), this Court is unable to determine from the decision how, if at all, the ALJ factored them into the restrictions imposed on standing and walking (or any other functional limitation for that matter).[6]

For all of the foregoing reasons, this case is remanded for further proceedings consistent with this opinion to reconsider the RFC determination.

## B.    Subjective Statements

---

[6]    Plaintiff also contends that the ALJ failed to consider the combined effect of heavy uterine bleeding (Doc. 16, at 15; Doc. 28, at 11-12), but ignores that she underwent a hysterectomy to address that condition. (R. 420, 1802-08).

Plaintiff challenges the ALJ's assessment of her subjective symptom allegations. (Doc. 16, at 11-15; Doc. 28, at 6-14). The regulations describe a two-step process for evaluating a claimant's own description of her impairments. SSR 16-3p, 2017 WL 5180304, at *2. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." *Id.* at *3. Second, if there is such an impairment, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . . ." *Id.* In evaluating a claimant's symptoms, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations . . . and justify the finding with specific reasons." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

The Court gives the ALJ's assessment of a claimant's subjective symptom allegations "special deference and will overturn it only if it is patently wrong." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) (internal quotations omitted); *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). A reviewing court should rarely disturb a subjective symptom assessment, as it lacks "the opportunity to observe the claimant testifying." *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006). The claimant bears the burden of showing that an ALJ's subjective symptom evaluation is patently wrong. *See Horr v. Berryhill*, 743 F. Appx. 16, 20 (7th Cir. 2018).

The ALJ stated that Plaintiff "allege[d] symptoms consistent with degenerative disk disease of the cervical spine, chronic kidney disease, osteoarthritis, [diastolic] dysfunction, fibroids, status post hysterectomy, and obesity." (R. 417). The ALJ noted

19

Plaintiff's testimony about her history of TIAs, heart palpitations, and swollen ankles from kidney disease. (*Id.*). The ALJ also noted Plaintiff's testimony that she had difficulty lifting objects due to cervical disk disease, lived in an apartment with her daughters, and was able to watch her grandchildren. (*Id.*). The ALJ then concluded that, although Plaintiff's impairments could reasonably be expected to cause the alleged symptoms, her statements about the intensity, persistence, and limiting effects was not entirely consistent with the evidence. (*Id.*).

Plaintiff faults the ALJ's failure to mention that she took Gabapentin for right arm pain and that the dosage could not be increased due to her kidney problems. (Doc. 16, at 13; Doc. 28, at 9). True, the ALJ did not address Plaintiff's use of Gabapentin, though the treatment records indicate that she experienced relief as a result. For example, in August 2015, Plaintiff reported to the neurologist that her pain was well controlled with Gabapentin and noted occasional radiating pain but denied weakness or numbness. (R.1587-89). And, in September 2016, Plaintiff complained to the neurologist of worsened pain in the right upper extremity, as well as occasional loss of right hand grip and difficulty opening bottles, but the pain settled with Tylenol, and Gabapentin was increased to a limited extent due to a combination of Plaintiff's chronic kidney disease, an apparent issue with her insurance coverage, and her report of considerable improvement of the pain and numbness as of December 2016. (R. 1604-06, 1621-27). As such, Plaintiff's improvement with a reduced dose of Gabapentin appears to be consistent with the ALJ's conclusions. But, given the absence of discussion, this Court cannot be certain whether the ALJ considered Plaintiff's use of medication for right arm pain.

Rather, in finding Plaintiff's allegations "not consistent with the evidence[,]" the ALJ focused primarily on her activities of daily living. (R. 420).[7] But, as Plaintiff notes (Doc. 16, at 13-14; Doc. 28, at 9-11), the ALJ did not account for her claimed degree of restriction in performing those activities. It is appropriate for an ALJ to consider a claimant's daily activities when evaluating credibility if it is done "with care" because "a person's ability to perform daily activities, especially if th[ey] can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013); *see Pratt v. Colvin*, No. 12 C 8983, 2014 WL 1612857, at *8-9 (N.D. Ill. Apr. 16, 2014) (ALJ erred in failing to disclose or account for plaintiff's limitations in performing household activities and did not explain how those minimal activities contradicted claimed pain and limitations).

Here, the ALJ did not discuss any evidence of limitations on Plaintiff's ability to perform activities of daily living, so it is unclear whether the ALJ considered this evidence. For example, the ALJ stated that Plaintiff was independent in her personal care activities (R. 420), but failed to mention Plaintiff's testimony that, when the right arm bothered her, one of her daughters helped her wash up and dress four times a week. (R. 475, 480).[8] Similarly, the ALJ emphasized that Plaintiff cared for her grandchildren (R. 417, 420), but ignored Plaintiff's testimony that the children watched television and played on their

---

[7] The ALJ also noted several medical records: the November 2016 MRI of the brain showing an age appropriate study; the January 2017 echocardiogram showing diastolic dysfunction but normal LV systolic function; and treatment notes documenting that, in March 2017, Plaintiff's palpitations were controlled with medication, and, in July 2017, she was doing well after a hysterectomy. (R. 420, citing R. 1620, 1679, 1857, 1872).

[8] The ALJ also alternately stated that Plaintiff lived in an apartment with her daughters (R. 417) and that she lived independently. (R. 420). Plaintiff testified that she lived in the same apartment complex as her adult daughters. (R. 456-57, 474-75, 477-78).

tablets when they visited. (R. 474-75). The ALJ likewise cited a function report in which Plaintiff indicated that she did cleaning, laundry, and grocery shopping (R. 420, citing R. 746), but not her statements that she needed help or encouragement doing those things when "not feeling good" (R. 746), and that she rested "whenever [she felt] fatigue" cleaning or doing laundry (R. 729), as well as her testimony that she did not go grocery shopping. (R. 476).

For the foregoing reasons, remand is necessary to reassess Plaintiff's subjective statements about her limitations. The Court does not suggest that consideration of the foregoing evidence requires a different result, only that the ALJ should address such evidence and explain its impact (if any) on the subjective symptom assessment.

## C.    VE Testimony

Plaintiff finally challenges the VE's testimony that her skills were transferable to other jobs. (Doc. 16, at 9-11; Doc. 28, at 5-6). The Commissioner does not dispute this argument. (Doc. 24, at 9-10). Instead, the Commissioner insists that such error was harmless (Doc. 24, at 9-10) because, based on the VE's testimony (R. 484-86, 502), the ALJ alternately found that Plaintiff could return to her past relevant work as a gambling cashier. (R. 421). But, as the Commissioner concedes (Doc. 24, at 10), that alternate finding cannot stand in light of the problems with the RFC determination discussed above. As such, remand is further required to consult a VE as appropriate based on reconsideration of the RFC determination.

## CONCLUSION

For the reasons stated above, Plaintiff's request for remand (Doc. 16) is granted as outlined above, and the Commissioner's Motion for Summary Judgment (Doc. 23) is

denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Social Security Administration for further proceedings consistent with this Order.

ENTER:

Dated:   September 1, 2020

_____

SHEILA FINNEGAN
United States Magistrate Judge